UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MANUEL CARVALHO CALVELOS<br><br>                              Plaintiff,<br><br>     -against-<br><br>CITY OF NEW YORK; NADENE PINNOCK;<br>ANTONIO CRUZ; ANGEL VILLALONA;<br>CLEMENT GLENN; DENISE PHILLIPS; MARY<br>RICHARDS; VAUGHN GRINNAGE; QUINCY<br>OUDEKERK; WILLA VERABAL; SURUJDYAL<br>RUPNARAIN; and DESHANDA CARTER<br><br>                              Defendants. | No. 19 civ. 6629 (CM) |

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DIMISS

McMahon, C.J.:

Plaintiff Manuel Carvalho Calvelos ("Plaintiff") was fired from his job as a probationary correction officer for the New York City Department of Correction ("DOC"). In March 2017, he was assigned to "West Facility" on Rikers Island. At West Facility, Plaintiff alleges that he was singled out, targeted, and ultimately terminated for being a different race than the warden, Clement Glenn, and his captains. Plaintiff observed and reported misconduct and corruption by Warden Glenn and his command staff. In retaliation for exposing their malfeasance, Defendants allegedly targeted, threatened, and ultimately terminated Plaintiff.

Seeking to vindicate his rights under Title VII, its state and local analogues, and the First Amendment, Plaintiff brings this suit against the City of New York, three DOC Deputy Commissioners, Warden Glenn, and seven captains at DOC's West Facility (collectively, "Defendants"). Plaintiff asserts federal claims for race, national origin, and ethnicity

discrimination and First Amendment retaliation pursuant to 42 U.S.C. § 1983; race discrimination under Title VII; and civil conspiracy for the same pursuant to 42 U.S.C. § 1985. He also asserts claims for wrongful termination, race discrimination under state and city statutes, and hostile work environment.

There are two motions to dismiss Plaintiff's complaint – the first filed by all Defendants except Deshanda Carter and Antonio Cruz (Dkt. No. 48), the second filed by Carter (Dkt. No. 56). Inexplicably, Cruz is included on the Defendants' reply brief in support of the first motion to dismiss (Dkt. No. 63). Carter noted that her motion is based on "substantially similar reasons" as those contained in the first motion to dismiss. (Carter Mot. to Dismiss at 11, Dkt. No. 58.) In fact, the two briefs are almost entirely identical. Accordingly, Defendants' arguments will be considered together unless otherwise indicated.

Defendants move to dismiss the Complaint in its entirety pursuant to Rules 12(b)(1) and 12(b)(6).

For the reasons discussed below, Defendants' motions are GRANTED in part and DENIED in part. Specifically:

(1) The motion to dismiss Count I is DENIED against Warden Glenn and the Deputy Commissioner Defendants and GRANTED against the Captain Defendants and the City;

(2) The motion to dismiss Count II is DENIED against Captain Oudekerk, Captain Phillips, Warden Glenn, and the Deputy Commissioner Defendants and GRANTED against the remaining Captain Defendants and the City;

(3) The motion to dismiss Count III is DENIED against the City and GRANTED against all individual defendants;

(4) The motion to dismiss to Count IV is DENIED against Warden Glenn and the Deputy Commissioner Defendants and GRANTED against the Captain Defendants and the City;

(5) The motion to dismiss to Count V is GRANTED against all Defendants;

(6) The motion to dismiss to Count VI is DENIED against the City, Warden Glenn, and the Deputy Commissioner Defendants and GRANTED against the Captain Defendants;

(7) The motion to dismiss to Count VII is DENIED against the City, Warden Glenn, and the Deputy Commissioner Defendants and GRANTED against the Captain Defendants; and

(8) The motion to dismiss to Count VIII is DENIED against the City, Warden Glenn, and the Deputy Commissioner Defendants and GRANTED against the Captain Defendants.

## BACKGROUND

### I.     The Defendants

Defendant City of New York (the "City") is a municipal corporation duly organized and existing under and by virtue of the laws of the City and State of New York. (Compl. ¶ 4, Dkt. No. 1.) DOC is an agency of, and is operated and managed by, the City. (*Id.* ¶ 3.) Each individual defendant was a public employee of DOC and the City during Plaintiff's tenure.

The three Deputy Commissioner Defendants held the following positions at all relevant times: Nadene Pinnock, Deputy Commissioner of DOC; Antonio Cruz, Deputy Commissioner of DOC's Investigation Division and Corrections Intelligence Bureau; and Angel Villalona, Acting First Deputy Commissioner of DOC (collectively, "Deputy Commissioner Defendants"). (*Id.* ¶¶ 5-7.)

Clement Glenn ("Warden Glenn") was the warden at DOC's West Facility on Rikers Island. (*Id.* ¶ 8.) Denise Phillips, Mary Richards, Vaughn Grinnage, Quincy Oudekerk, Willa

Verabal, Surujdyal Rupnarain, and Deshanda Carter ("Captain Defendants") were captains at West Facility. (*Id.* ¶¶ 10-15.) Captain Phillips was one of Plaintiff's direct supervisors. (*Id.* ¶ 9.)

Plaintiff sues each individual defendant in both his or her individual and official capacity. (*Id.* ¶ 16.)

## II.    **Plaintiff's Positions and Uses of Force**

On January 14, 2016, Plaintiff was hired as a correction officer ("CO") by DOC. (Compl. ¶ 26.) His probationary period was two years, or until January 13, 2018. (*Id.* ¶ 27.)

After completing DOC's correction academy, in May 2016 Plaintiff was assigned to the George Motchan Detention Center ("GMDC") on Rikers Island. (*Id.* ¶ 29.) In March 2017, he was transferred to West Facility, also on Rikers. (*Id.*)

Plaintiff was terminated on January 5, 2018 – eight days shy of the end his probationary period. The official reason for his termination included his involvement in two uses of force ("UOFs") that occurred while he was stationed at GMDC. (*Id.* ¶¶ 28, 130).

Plaintiff describes DOC's progressive disciplinary system: (1) an oral reprimand; (2) a corrective interview; (3) a command discipline ("CD"); and (4) a memorandum of complaint ("MOC"). (*Id.* ¶ 57.) When an officer is served with a CD for an incident, the incident is investigated, and a deputy warden conducts a hearing. (*Id.* ¶ 58). At West Facility, commanders would often offer a "plea deal" – the offending officer could agree to be docked a certain number of vacation days as discipline to avoid a hearing and record about the incident. (*Id.* ¶ 60). If an officer rejected the plea deal, the CD would be converted into a MOC, which leads to formal charges carried out by DOC's trials and litigation division. If a CD was not converted to a MOC, did not result in a plea deal, or was dismissed on the merits, it "was effectively an acquittal and a permanent dismissal of the underlying incident." (*Id.* ¶ 61).

At GMDC, Plaintiff was assigned to work "Three Upper Intake." Per the Complaint, "Defendants frequently assigned Plaintiff to these high inmate-contact posts, such as Three Upper Intake, because of his size, strength, and willingness to do whatever was needed to help the team." (*Id.* ¶ 70.) Three Upper Intake was a demanding, inmate interaction-intensive, and understaffed post that often resulted in more CO UOFs on inmates. (*Id.* ¶¶ 65-69.) Two such UOFs ultimately led to Plaintiff's termination.

On July 15, 2016, Inmate James Sanders tried to hit Plaintiff with a mop handle, and Plaintiff "thwarted the attack by using force." (*Id.* ¶ 75.) The command staff at GMDC determined that the UOF was within DOC guidelines, so the incident did not result in a CD, formal charges, or any discipline. (*Id.* ¶ 77.)

On July 26, 2016, Inmate Zaire Maddox spit on Plaintiff from behind a gate, and as he prepared to spit on Plaintiff again, Plaintiff sprayed him with pepper spray. Plaintiff pled guilty to a CD for his UOF on Maddox. In exchange for accepting this pre-hearing plea bargain, Plaintiff was docked one vacation day. (*Id.* ¶¶ 72-74).

Plaintiff alleges that he was not involved in any other uses of force at GMDC that resulted in discipline. (*Id.* ¶ 78.)

After these two incidents, Plaintiff was approved to carry a firearm and was transferred to West Facility. Neither of these things could have occurred if Plaintiff had any pending disciplinary charges, serious infractions, or significant disciplinary history. (*Id.* ¶¶ 80-83.)

### III.    Alleged Misconduct at West Facility

In March 2017, Plaintiff was transferred to West Facility. Plaintiff's claims arise out of the events that ensued at West Facility in 2017.

Plaintiff alleges that Defendants targeted him on account of his race – he is Caucasian, whereas Warden Glenn and the Captain Defendants are of West Indian descent. (*Id.* ¶¶ 145, 161, 175, 180.) He also asserts "on information and belief" that *all* individual defendants are of West Indian descent. (*Id.* ¶ 31.) Defendants allegedly "assign[ed] him to the most dangerous inmate-interactive posts, encourage[ed] inmate attacks on Plaintiff, suppress[ed] UOFs, threaten[ed] Plaintiff with termination and other disciplinary action, and ultimately terminat[ed] Plaintiff without cause, or with manufactured pretextual cause." (*Id.* ¶¶ 146, 155, 162, 174, 182.)

#### a.    Dangerous Assignments

At West Facility, Plaintiff was initially assigned to the communicable disease unit and Sprung 10. (*Id.* ¶¶ 87-88.) Sprung 10 in particular "was considered an even more dangerous and assaultive post than Plaintiff's previous posts, which was dominated by inmates who were affiliated with gangs." (*Id.* ¶ 89.)

In July or August 2017, Plaintiff was reassigned to a new housing unit at West Facility. (*Id.* ¶ 114.)

#### b.    Staff Misconduct

Throughout Plaintiff's employment at West Facility, he reported staff misconduct to the Captain Defendants. Plaintiff alleges that the Captain Defendants failed to take any action to investigate Plaintiff's concerns and often served Plaintiff with CDs shortly after he complained.

On March 27, 2017, Captain Rupnarain asked Plaintiff to testify falsely on his behalf about a traffic ticket. Plaintiff refused, and reported Captain Rupnarain's request to Captain Phillips.

Plaintiff was then served "with a CD for two bogus UOFs." (*Id.* ¶¶ 95-97.) At the CD hearing for these UOFs, Plaintiff told his union delegates that (a) he felt that his superiors were targeting him; (b) Warden Glenn would frequently enter inmates' cells and spend long periods of time there; and (c) other staff went into inmates' cells and passed contraband to inmates. (*Id.* ¶ 98.)

In May 2017, Plaintiff told Captains Phillips, Oudekerk, and Grinnage that Captain Richards had "twerked" for an inmate while he masturbated so the inmate would return a razor to her. The captains did not investigate or otherwise respond to Plaintiff's report. (*Id.* ¶ 99.)

Also around May 2017, Plaintiff told Captains Phillips, Oudekerk, and Grinnage that three of his fellow COs were planting contraband in inmates' cells after those inmates had assaulted staff. Allegedly in retaliation for Plaintiff's report of COs smuggling and planting contraband, Captain Richards ordered Plaintiff to write a report to Warden Glenn regarding the Red Wing boots Plaintiff wore to work. In his report, Plaintiff explained his boots were prescribed by a doctor and did not violate DOC's prohibition against "mesh" sneakers. Nevertheless, Captain Richards served Plaintiff with a CD. At a CD hearing on October 3, 2017, Warden Glenn tried to make Plaintiff plead guilty to the boots CD. Plaintiff refused and the matter was "dismissed and/or not pursued." (*Id.* ¶¶ 100-03.)

This "pattern" continued for months:

(1) Plaintiff was targeted on account of his race and assigned to the most violent posts; (2) Plaintiff did his job, which exposed and undermined the corruption that Warden Glenn and his staff were engaged in; (3) Warden Glenn and his staff coerced Plaintiff to "hold it down" or face disciplinary action; (4) Plaintiff refused to be coerced, was served with a CD or other disciplinary notice; (5) Plaintiff would refuse to accept a plea to bogus disciplinary charges; and (6) Plaintiff would effectively be acquitted of the purported misconduct.

(*Id.* ¶ 105.)

After witnessing the exchange of contraband between inmates and correctional staff throughout July 2017, Plaintiff consulted an outside deputy warden, Joseph Caputo, about the contraband and Warden Glenn and the Captain Defendants' failure to take any corrective action. (*Id.* ¶ 110.) Plaintiff alleges that, "Deputy Warden Caputo told Defendants that Plaintiff consulted him," and then Captain Oudekerk and Captain Phillips threatened Plaintiff not to contact any outside staff about the smuggling of contraband and assaults on staff. (*Id.* ¶ 111.)

### c.   Inmate Attacks

Plaintiff describes DOC's policies about UOFs – or uses of force – and AOSs – or assaults on staff. DOC staff involved in a UOF are required to report the incident to their commanding officer, who in turn must log and investigate their subordinate officers' UOFs as well as any assaults of staff ("AOSs"). (*Id.* ¶¶ 47-50.) Plaintiff alleges that Warden Glenn and the Captain Defendants intentionally underreport, suppress, and fail to investigate UOFs and AOSs to make their units look better and shield against discipline, prosecution, and civil liability. (*Id.* ¶¶ 51-54.)

When Plaintiff was attacked by inmates twice in March 2017, the incidents were either suppressed or misreported. (*Id.* ¶¶ 92-93.) Specifically, one incident was written up as a UOF instead of an AOS/UOF. With respect to the second incident, Warden Glenn and Captain Grinnage told Plaintiff to "hold it down" – i.e., do not to report it – and they did not report it themselves. (*Id.*) This practice continued throughout Plaintiff's employment at DOC. (*Id.* ¶ 94.)

Plaintiff alleges that inmates attacked him "at the behest of, or at least without condemnation by, Warden Glenn." (*Id.* 106.) These attacks were often misreported, and Warden Glenn and the Captain Defendants ridiculed, threatened, and served Plaintiff with CDs for his involvement.

Around June 11, 2017, Plaintiff used force on an inmate whose aunt was an assistant deputy warden at GDMC at the time. Although Plaintiff reported the UOF to Captain Oudekerk, Captain Oudekerk denied receiving notice and served Plaintiff with a CD for an unreported anticipated UOF. (*Id.* ¶ 107.) This UOF was also cited as a reason for Plaintiff's termination. (*Id.* at ¶ 133.) Warden Glenn called Plaintiff to his office. "In an attempt to protect Assistant Deputy Warden Cox and Cox's nephew, Warden Glenn threatened Plaintiff with immediate firing if it ever happened again. Captain Grinnage was also present." (*Id.* ¶ 107.)

On June 21, 2017, Plaintiff was hospitalized due to an inmate assault. He found out that Warden Glenn had been fraternizing with the inmates, and the inmates had put a "hit" out on Plaintiff's life. "Warden Glenn did not do anything to protect Plaintiff, and Plaintiff refused to be silenced. That same day, Plaintiff was served with a notice to appear before a hearing regarding an incident from August 2016 at GMDC," but "all allegations of disciplinary infractions against him were either not pursued or dismissed." (*Id.* ¶¶ 108-09.)

Plaintiff alleges that Defendants retaliated against him for "maintaining order among the inmates in the housing units, i.e., for running a respectful, but 'tight ship.'" (*Id.* ¶ 113.) Around September 2017, an inmate told Plaintiff a recent slashing was meant for him. The inmate asked Warden Glenn to transfer Plaintiff because he was "too strict," to which Warden Glenn responded, "do what you have to do to get him out." (*Id.* ¶ 117.) By doing so, Warden Glenn "implicitly instructed Inmate Williams to attack Plaintiff, and condoned future attacks." (*Id.*) That same week, inmates threatened and attempted to slash Plaintiff, but not all attempts were reflected in the daily reports. (*Id.* ¶ 118.) Plaintiff was served with three CDs for UOFs from his attempts to stop inmates from passing marijuana between their cells and trying to slash him and other COs. (*Id.* ¶¶ 114-20.)

Later in September 2017, Captain Morales instructed Plaintiff to bring his paperwork about the recent inmate attacks to Captain Verabal. The paperwork "exposed the contraband, the failure to report and properly search for the contraband, and the recent spate of attacks." (*Id.* ¶ 122.) Allegedly in retaliation, Plaintiff was "set-up" to abandon his post, for which he received a CD from Captain Carter. (*Id.*) Shortly thereafter, Captain Phillips warned Plaintiff – again – about reporting abuse and corruption. (*Id.* ¶ 124.)

       d.  <u>Plaintiff's Termination</u>

On October 3, 2017, Plaintiff reported to a CD hearing in Warden Glenn's office for the three CDs from September as well as the May 2017 CD for his Red Wing boots. When Plaintiff refused to plead guilty to the CDs, "Warden Glenn erupted in anger," "cursed at Plaintiff, called him 'racist,' claimed that Plaintiff had brought contraband into West Facility, and promised Plaintiff that he would be fired before his probationary period was over so that he would not receive the job protections of a regular CO." (*Id.* ¶¶ 125-27.) Plaintiff alleges that "Warden Glenn explicitly mentioned Plaintiff's race when he promised to terminate Plaintiff during the October 3, 2017 meeting." (*Id.* ¶¶ 146, 162, 176, 182.)

After the October 3 meeting, Plaintiff states that he "responded by documenting the rampant corruption and abuse that he had been reporting to Warden Glenn and others for months, and that this put officers' lives in danger, including his own" as well as "the racism that he experienced—specifically, that Warden Glenn favored individuals who were of West Indian descent, and that Warden Glenn intentionally and maliciously assigned Plaintiff to the most dangerous posts, manufactured phony charges resulting from these dangerous posts, and refused to protect him against verifiable inmate threats." (*Id.* ¶ 128.)

Around October 27, 2017, DOC instituted a new policy under which two UOFs outside of DOC guidelines constituted "cause" for termination. (*Id.* ¶ 129.) In an Investigation Report dated October 31, 2017, Deputy Commissioner Cruz recommended that Deputy Commissioner Pinnock terminate Plaintiff for his two UOFs at GMDC in July 2016 on Inmate Maddox and Inmate Sanders. (*Id.* ¶¶ 129-30; Ex. B to Blair Decl., Dkt. No. 49-2.) Plaintiff notes that these two incidents were either resolved or dismissed. (Compl. ¶ 133.) Moreover, he alleges that it is uncommon for DOC to terminate a probationary employee for UOFs. (*Id.* ¶ 136.) The Investigation Report contended that Plaintiff also gave false or misleading testimony about the altercation with Inmate Sanders. (Ex. B. at 3.)

At some point between October 31, 2017 and December 2017, Plaintiff filed a complaint with New York City's Office of Equal Employment Opportunity ("EEO") against Warden Glenn for racial discrimination. (Compl. ¶ 137.) The EEO subsequently notified Warden Glenn about the complaint. (*Id.* ¶ 138.)

On December 21, 2017, Deputy Commissioners Cruz and Villalona submitted Plaintiff's official personnel determination review ("PDR") to Pinnock, making a final determination to terminate Plaintiff. (*Id.* ¶ 131.) The PDR effectively adopted the findings of the Investigation Report, including the finding that Plaintiff gave false or misleading testimony and adding that he failed to notify a supervisor about the "anticipated" UOF on June 11, 2017.[1] ( Compl. ¶ 133, Ex. I to Blair Decl., Dkt. No. 49-9.) On January 5, 2018, Deputy Commissioner Pinnock told Plaintiff that he was terminated. (Compl. ¶ 139.)

---

[1] Per the Use of Force Directive attached to Defendants' motion, an anticipated use of force is a situation where an officer could predict that a confrontation with an inmate will require the use of force, such as when an inmate refuses to: go to court, leave a cell when ordered to do so, or comply with search procedures. (Ex. E to Blair Decl., Dkt. No. 49-5, at 2.)

e.   Procedural History

On May 2, 2018, Plaintiff brought an Article 78 proceeding against DOC Commissioner Cynthia Brann, DOC, and the City in New York state court, alleging that his termination was (a) retaliatory and in violation of Civil Service Law § 75-b; and (b) done in bad faith such that he deserves a hearing and a statement of reasons. *See Calvelos v. Brann et al.*, No. 154110/2018 (N.Y. Sup. Ct., N.Y. Cty. May 2, 2018) (N.Y. Dkt. No. 1). (Ex. C to Blair Decl., Dkt. No. 49-3.) Specifically, Plaintiff alleged that his termination was retaliatory – either because he reported Warden Glenn's practice of smuggling contraband to inmates to DOC and/or because he filed an EEO complaint of discrimination with the DOC on November 8, 2017. (*Id.* ¶¶ 86-91.) He claimed that his allegedly retaliatory termination violated Civil Service Law § 75-b(2)(a) – which protects employees who blow the whistle on perceived improper government action – and was done in bad faith. Notably, Plaintiff did not assert causes of action based on racial discrimination or First Amendment retaliation, as he does in the present action.

On October 10, 2019, the New York County Supreme Court decided that Plaintiff had raised an issue of substantial evidence such that his application to vacate and annul his termination was transferred to the Appellate Division, First Department, for disposition pursuant to CPLR 7804(g). (N.Y. Dkt. No. 82; Ex. 1 to Defs.' Reply, Dkt. No. 63-1.) The matter remains pending.

On June 11, 2018, Plaintiff filed charges of retaliation and discrimination under Title VII with the New York State Division of Human Rights ("NYSDHR") and the NYSDHR forwarded the claim to the U.S. Equal Employment Opportunity Commission ("EEOC"). (Compl. ¶ 22.) The NYSDHR investigated Plaintiff's claim and "closed the file without taking further action." (*Id.* ¶ 23.) The EEOC adopted the NYSDHR's findings and served Plaintiff with a Notice of Right to

Sue letter on April 17, 2019. (*Id.* ¶ 24.) Plaintiff filed this case ninety days later, on July 16, 2010. (*Id.* ¶ 25.)

**ANALYSIS**

This case is about the termination of a probationary employee. As a probationer, Plaintiff enjoys only limited employment protections. But even a probationary employee cannot be discharged on the basis of his race, or in retaliation for his exercise of free speech protected under the First Amendment.

Assuming the allegations of the complaint to be true (as I must on this pre-answer motion to dismiss), Plaintiff was transferred to West Facility after ten months at GMDC, where he served successfully. In his new posting, Warden Glenn and his command staff – all of whom are of West Indian descent – are alleged to have treated West Indian COs more favorably than Plaintiff, who is Caucasian. They assigned Plaintiff to the toughest posts, subjected him to an arbitrary system of discipline, and encouraged inmates to attack him.

At West Facility, Plaintiff began noticing a wide variety of staff misconduct: requesting false testimony, "twerking" for inmates, planting contraband on inmates, encouraging inmates to attack staff, and misreporting these attacks as UOFs rather than AOSs. Plaintiff's attempts to report this misbehavior earned him condemnation rather than commendation. Even Plaintiff's efforts to keep order among the inmates were met with hostility. His requests to the Captain Defendants to search inmates for dangerous contraband fell on deaf ears.

The months of mistreatment came to a head on October 3, 2017. Plaintiff attended a meeting with Warden Glenn about four undeserved CDs Plaintiff had received. When he refused to plead guilty, Warden Glenn showed his true colors: he erupted in anger, cursed at Plaintiff, called him "racist," claimed that it was *Plaintiff* who was bringing contraband into West Facility,

13

and threatened to fire him before he became a fully-fledged CO – specifically mentioning Plaintiff's race as a part of that threat. Within a matter of four weeks, DOC protocols were changed, so that two UOFs outside of DOC guidelines warranted termination, and a mere four days later Deputy Commissioner Cruz recommended Plaintiff's termination – not based on the numerous CD charges that had been brought against him at West Facility, but on two UOFs from GMDC that occurred more than 15 months prior, and that were resolved – one to which Plaintiff had already pled guilty and been docked one vacation day, and another that was investigated and resolved without discipline. When Plaintiff complained to the City's EEO Office about Warden Glenn's racial discrimination, Deputy Commissioners Cruz and Villalona adopted the recommendation to terminate Plaintiff in a PDR. Plaintiff was fired on January 5, 2018 – a week before his probationary period would have expired.

As Plaintiff puts it, "Warden Glenn kept his promise about terminating Plaintiff." (Compl. ¶ 129.)

Before turning to the merits of Defendants' motion to dismiss, there are a few preliminary matters to resolve.

*First*, Defendants had asked this Court to stay discovery per Rule 26(c). However, they concede in their replies that discovery has in effect been stayed. (Defs.' Reply at 2, Dkt. No. 63; Carter's Reply at 2, Dkt. No. 65.) As I am not dismissing most of the Complaint, I will not further stay discovery. It should begin forthwith.

*Second*, in his opposition, Plaintiff asks this Court to strike or disregard the materials included in Defendants' motion to dismiss. Plaintiff references and relies on the Investigation Report (Ex. B to Blair Decl., Dkt. No. 49-2) and the PDR (Ex. I to Blair Decl., Dkt. No. 49-9) in the Complaint, so this Court may consider these documents. *See Chambers v. Time Warner, Inc.*,

282 F.3d 147, 153 (2d Cir. 2002). Defendants' remaining exhibits, while relevant to the Complaint, are not "integral" thereto. Therefore, ordinarily the Court would not consider them on a motion to dismiss.

However, all of Defendants' exhibits are public records that were filed in connection with Plaintiff's Article 78 proceeding. *See Franza v. Stanford*, No. 16-cv-7635, 2019 WL 452053, at *2 n.3 (S.D.N.Y. Feb. 5, 2019). The Complaint does not mention or otherwise rely on the Article 78 proceeding. Accordingly, this Court takes judicial notice of these documents, "not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) (internal quotation and citation omitted). Plaintiff's motion to strike is denied.

## I.     Standard of Review

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 556). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal quotations, citations, and alterations omitted). Thus, unless a plaintiff's well-pleaded allegations have "nudged [its] claims across the line from conceivable to plausible, [the plaintiff's] complaint must be dismissed." *Id.* at 570; *Iqbal*, 129 S. Ct. at 1950–51. The Court must accept all factual allegations

as true and draw all reasonable inferences in Plaintiff's favor. *ATSI Commc'ns., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

## II.   Counts I and III: Plaintiff's § 1981 and Title VII Claims Alleging Racial Discrimination are Dismissed in Part.

In Count I, Plaintiff alleges that Defendants targeted him on account of his race by taking a variety of adverse employment actions against him and retaliating against him for complaining about discrimination in violation of 42 U.S.C. § 1981. He brings his claim under 42 U.S.C. § 1983. In Count III, Plaintiff brings the same claims under Title VII. Because Counts I and III effectively merge as a matter of fact, I will discuss these two counts together.

In this section, I will not address the issue of hostile work environment. Hostile work environment is a particular manifestation of race discrimination, so it is actionable under § 1981 and Title VII. However, Plaintiff has elected to bring his hostile work environment claim as a separate count, presumably under federal, state, and city law. I will defer any discussion of hostile work environment until we reach Count VIII. *See infra* Section VIII.

### a.   Time Bar

With respect to Count III only, Defendants move to dismiss as time-barred any of Plaintiff's Title VII claims that are based on discrete discriminatory acts that occurred prior to August 15, 2017.

Plaintiff filed charges of retaliation and discrimination under Title VII with the NYSDHR on June 11, 2018. The NYSDHR forwarded Plaintiff's claim to the EEOC. (Compl. ¶ 22.) Complaints of discrete discriminatory or retaliatory acts under Title VII must be filed within 300 days of the date of the act. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 (2002) [hereinafter *Morgan*]; *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 78–79 (2d Cir. 2015).

A "continuing violation" exception "exists for claims that the discriminatory acts were part of a continuing policy and practice of prohibited discrimination" such as "cases involving specific discriminatory policies or mechanisms." *Valtchev v. City of New York*, 400 F. App'x 586, 588 (2d Cir. 2010) (internal citations and quotations omitted).

Plaintiff contends that all of the adverse actions Plaintiff suffered were inherently and reasonably related such that they satisfy the *Butts v. City of New York Department of Housing Preservation & Development*, 990 F.2d 1397 (2d Cir. 1993) exception as well as the continuing violation rule. Defendants counter that Plaintiff's allegations consist of discrete acts such as assignments or disciplinary action that were not taken pursuant to a discriminatory policy or mechanism and therefore are not subject to the continuing violation exception. Moreover, they argue that this exception is disfavored in the Section Circuit and requires a showing of compelling circumstances. And lastly, Defendants assert that Plaintiff cannot rely on the exception because he did not invoke it in his EEOC charge.

The court agrees with Defendants. Plaintiff alleges discrete acts – such as termination, unfavorable job assignments, and the like – that cannot form the basis of a continuing violation claim. *See Gutierrez v. City of New York*, 756 F. Supp. 2d 491, 500 (S.D.N.Y. 2010). Any claim of discrimination based on discrete acts prior to August 15, 2017 are outside the 300-day period. Therefore, Plaintiff's claims based on these acts are barred, though the court may consider them as "background evidence." *See Morgan*, 536 U.S. at 113.

The only claim as to which this is not true is Plaintiff's hostile work environment claim, Count VIII, which is inherently "continuing." *See Morgan*, 536 U.S. at 115; *infra* Section VIII(a).

b.  <u>Discrimination</u>

Section 1981 "outlaws discrimination with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship, such as employment, and is applicable to a plaintiff complaining of discrimination during an employment period of probation." *Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 224–25 (2d Cir. 2004) (internal citations omitted). Section 1983 is the exclusive remedy for § 1981 violations by state actors. *See id.* at 225. Title VII prohibits an employer from discriminating against an employee because of the employee's race, color, religion, sex, or national origin. *See* 42 U.S.C. § 2000e-2(a). Both claims are analyzed under the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015).

At the motion to dismiss phase, a plaintiff need only establish a prima facie case of discrimination. The plaintiff must plausibly allege that "the plaintiff is a member of a protected class, was qualified, [and] suffered an adverse employment action." *Id.* at 311. Under Title VII, the plaintiff must allege "at least minimal support for the proposition that the employer was motivated by discriminatory intent." *Id.* Under § 1981, a plaintiff must plead that race was a but-for cause of the adverse action. *See Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020). In either case, the plaintiff must allege facts that allow the court to infer the defendant's intent to discriminate on the basis of race. *See Obi v. Westchester Med. Reg'l Physician Servs., P.C.*, No. 19-cv-3022, 2020 WL 1434159, at *6 (S.D.N.Y. Mar. 23, 2020).

Without distinguishing among the various individual defendants, Plaintiff alleges that "Defendants" assigned him to the most dangerous inmate-interactive posts, encouraged inmates to attack him, suppressed UOFs, threatened him with termination and other disciplinary action, and ultimately terminated him without cause, or with manufactured pretextual cause – all on account

of his race. (Compl. ¶ 146.) Specifically, Plaintiff is Caucasian whereas all individual defendants are of West Indian descent. (*Id.* ¶¶ 31, 145.)

I note that Plaintiff's employment discrimination claim reaches the core of § 1981's protection to make and enforce contracts – he was fired just before he could enter into permanent employment status, which carries with it certain rights and privileges and protections and so is a different contract of employment than being a probationer. This informs the court's consideration of his allegations.

Plaintiff easily satisfies the first three elements. He has also provided sufficient support for the proposition that Warden Glenn and the Deputy Commissioner Defendants were motivated by discriminatory intent and would not have acted against Plaintiff but for his race. Count I thus survives against these four Defendants and Count III survives against the City.

*First*, Plaintiff is a member of a protected class by virtue of his being "Caucasian." *See McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 278–80 (1976) (noting that discrimination is prohibited "against the white petitioners in this case upon the same standards as would be applicable were they [black] and [respondent] white."). This Court pays no mind to Plaintiff's assertion of new facts about his Hispanic ethnicity in his opposition papers. *See Gone v. Wackenhut Servs. Inc.*, No. 10-cv-2495, 2010 WL 2077210, at *3 (S.D.N.Y. May 17, 2010) (citing *Peabody v. Weider Publ'ns, Inc.*, 260 F. App'x 380, 384 (2d Cir. 2008)).

*Second*, there is no dispute that Plaintiff was qualified for his position as a Correction Officer. (Defs.' Reply at 5.)

*Third*, there is no dispute Defendants' threats of termination and Plaintiff's actual termination constitute adverse employment actions. (Defs.' Mem. in Supp. of Mot. at 14, Dkt. No. 50.) Defendants argue that certain other of Plaintiff's alleged adverse employment actions were

not materially adverse; specifically, that Plaintiff was assigned to the most dangerous inmate-interactive posts, inmates were encouraged to attack Plaintiff, and UOF incidents were suppressed. Lacking evidence about these matters at the pre-answer stage, I will assume arguendo that being assigned to an allegedly undesirable post could be an adverse employment action. Certainly having one's superiors encourage inmates to attack a correctional employee qualifies as an adverse action, assuming, of course,  that this in fact happened.

*Fourth*, Plaintiff's allegations that Warden Glenn mentioned his race and threatened he would be fired – a threat that came to fruition in a matter of weeks, in circumstances that appear at first blush to be highly suspicious – support an inference that Warden Glenn and the Deputy Commissioner Defendants were motivated by a racial animus.

> An inference of discrimination can arise from:
>
> the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge; or when an employer replaces a terminated or demoted employee with an individual outside the employee's protected class.

*Franchino v. Terence Cardinal Cook Health Care Ctr., Inc.*, 692 F. App'x 39, 41–42 (2d Cir. 2017) (quoting *Littlejohn*, 795 F.3d at 312–13).

*Ethnically degrading terms or invidious comments*

Plaintiff's allegations as to Warden Glenn's discriminatory remark support an inference of discrimination.

The fact that Warden Glenn allegedly called Plaintiff "racist" would not, without more, evince a racial animus on the part of Warden Glenn. *See Frascatore v. Blake*, 344 F. Supp. 3d 481, 492–93 (S.D.N.Y. 2018); *see also Squitieri v. Piedmont Airlines, Inc.*, No. 3:17-cv-441, 2018 WL 934829, at *3 (W.D.N.C. Feb. 16, 2018). But here, Plaintiff alleges more. He alleges that the

Warden explicitly mentioned Plaintiff's race (not his being "racist," which is something altogether different) when he promised to fire Plaintiff at the October 3 meeting. (Compl. ¶¶ 146, 162, 176, 182.) Verbal remarks may raise an inference of discrimination where there is a causal nexus between the remarks and the adverse employment action. *LaSalle v. City of New York*, No. 13-cv-5109, 2015 WL 1442376, at *5 (S.D.N.Y. Mar. 30, 2015).

Despite Plaintiff's claim in his opposition that Warden Glenn "repeatedly mentioned" his race, (Pl.'s Mem. in Opp'n ("Opp'n"), Dkt. No. 59 at 12), this overstates the allegations in the Complaint. There is no allegation of any "repeated" comments regarding Plaintiff's race. Nevertheless, this single reference to Plaintiff's race – spoken, it is alleged, in the same conversation in which Plaintiff was threatened with termination – carries Plaintiff's minimal burden at the pleading stage.

Putting the single comment into context establishes the correctness of this position. Warden Glenn, Plaintiff's top supervisor at West Facility, allegedly mentioned Plaintiff's race – after months of dangerous assignments, baseless UOFs, and "phony" CDs – at the October 3 meeting where he "promised Plaintiff that he would be fired before his probationary period was over." (Compl. ¶¶ 127, 146.) Within a matter of weeks, efforts to fire Plaintiff had begun, in the wake of a sudden and unexplained change in rules that rendered his UOFs at GMDC – UOFs that resulted in little or no discipline, and that were followed by allowing Plaintiff to carry a weapon and transfer facilities – fodder for dismissal. Approximately three months later, Plaintiff was officially terminated, in circumstances that could suggest to a trier of fact that racism played a role – circumstances ranging from Warden Glenn's remark about Plaintiff's race to the fact that rules were jiggered so that DOC would not have to rely on discipline meted out by the allegedly racially

motivated supervisors (and about whom he had complained) in order to get rid of Plaintiff. *See Schreiber v. Worldco*, LLC, 324 F. Supp. 2d 512, 519 (S.D.N.Y. 2004)).

Ergo, Plaintiff has stated a claim against Warden Glenn to the extent he was involved in the various adverse employment actions inflicted on Plaintiff during his tenure at West Facility – whether personally or via the Captain Defendants acting at Warden Glenn's direction. Warden Glenn's racial (not "racist") remark on October 3 casts his actions over the preceding seven months in a potentially different light, such that I am unwilling to dismiss the claim that Plaintiff's race was not the source of his animosity.

Similarly, Plaintiff has stated a claim against Warden Glenn for his termination. Where a defendant is "meaningfully involved in the process leading to the adverse employment action," that defendant may be held liable for the action. *See Edrisse v. Marriott Int'l, Inc.*, 757 F. Supp. 2d 381, 389–90 (S.D.N.Y. 2010). The sequence of events alleged in the Complaint suggests that Warden Glenn was "meaningfully involved in the process" leading to Plaintiff's termination. *See id.* Warden Glenn promised Plaintiff would be fired; within a matter of weeks, DOC had altered its rules and recommended Plaintiff's termination. (Compl. ¶ 129.) These allegations support an inference that Warden Glenn was either directly involved in or otherwise instigated Plaintiff's termination. We shall see what discovery reveals.

*Sequence of Events*

Considering all of Plaintiff's allegations as a whole, the "sequence of events leading to the plaintiff's discharge" plausibly supports an inference of discriminatory motivation for the Deputy Commissioner Defendants as well. *Littlejohn*, 795 F.3d at 311.

Plaintiff alleges that "Warden Glenn kept his promise about terminating Plaintiff." (Compl. ¶ 129.) Specifically, less than four weeks after the October 3 meeting, DOC modified its policy

such that COs could be terminated for two UOFs outside of guidelines. Four days after that, on October 31, Deputy Commissioner Antonio Cruz recommended Plaintiff's termination to Deputy Commissioner Nadene Pinnock in the Investigation Report. (*Id.*; Ex. B.) The Investigation Report identified Plaintiff's two UOFs in July of 2016 (with inmates Maddox and Sanders) as the reasons for his termination – i.e., events that occurred nearly fifteen months prior to the recommendation and had been completely resolved. (*See* Compl. ¶ 130.) Similarly, the December 21 PDR – containing DOC's final recommendation – submitted by Cruz and Deputy Commissioner Angel Villalona to Pinnock stated the same reason for termination, along with an unwarranted "anticipated" UOF that was directly contradicted by video evidence, investigated, and ultimately dismissed. (Compl. ¶¶ 131, 133; Ex. I.) Pinnock ultimately terminated Plaintiff on January 5 (Compl. ¶ 139).

All involved knew full well Plaintiff's UOFs occurred over a year earlier or were dismissed without discipline, that he had no disciplinary record since June of 2016, and his final evaluation scores were strong across the board. (*Id.* ¶ 132; Ex. I.) Plaintiff was approved to carry a firearm and for transfer, neither of which, it is alleged, could have occurred if Plaintiff had any pending disciplinary charges, serious infractions, or a significant disciplinary history during his tenure at GMDC. (Compl. ¶¶ 80-83.) Yet it was UOFs during this remote period of time that allegedly justified Plaintiff's termination.

Moreover, Plaintiff alleges that it is "highly unusual" for DOC to terminate a probationary employee outright, rather than extend probation. (*Id.* ¶ 136.) This would, of course, be especially true where the events allegedly warranting termination occurred well over a year earlier.

Of course, the but-for cause of any Defendant's adverse action must be Plaintiff's race – i.e., he or she would not have terminated Plaintiff but for the fact that he is Caucasian. But at the

pleading stage, that hurdle is easily surmounted. The Deputy Commissioner Defendants are alleged to have approved Plaintiff's rather strange-seeming termination shortly after Warden Glenn – who is plausibly alleged to have been motivated by Plaintiff's race – threatened to be sure he was fired.

Crediting Plaintiff's allegations and drawing all inferences in his favor, the sequence of events leading to Plaintiff's discharge plausibly supports an inference of discriminatory motivation for Deputy Commissioners Cruz, Villalona, and Pinnock.

However, while Count I, Plaintiff's § 1981 discrimination claim, survives against Warden Glenn and the Deputy Commissioner Defendants, it is dismissed, albeit without prejudice, against the Captain Defendants.

Aside from general and conclusory statements about the fact that Plaintiff is white and Defendants are West Indian, the Complaint does not allege facts sufficient to give rise to an inference of race discrimination for the Captain Defendants. If Plaintiff seeks to pursue his discrimination claims against the Captain Defendants, he must amend his Complaint to allege specific instances of disparate treatment, discriminatory remarks, or another indicium of racial animus on behalf of each Captain Defendant.

I am undeterred by Defendants' one-sentence argument – raised in a footnote – that qualified immunity protects the individual defendants, and advise them to consult my local rules on the making of qualified immunity motions. Since Defendants have not followed my rules, and have not seen fit to make such an argument (like the Second Circuit, I do not accept arguments raised in footnotes), the issue will have to abide summary judgment. I do note that no reasonable correction officer could possibly have thought that it was legal to fire an officer because of his race.

Count I, the § 1981 claim brought via § 1983, is also dismissed as against Defendant New York City. Plaintiff has not sufficiently alleged municipal liability. "Under *Monell*, the City can be liable under § 1983 only when the alleged deprivation of rights occurs pursuant to a governmental policy, custom, or usage." *Cotto v. City of New York*, 803 F. App'x 500, 503 (2d Cir. 2020) (citing *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690–91 (1978)).

Plaintiff does not plausibly allege that he was discriminated against pursuant to any policy, custom, or practice. The "pattern" he alleges (*see* Compl. ¶ 105) only involves racial discrimination in *Plaintiff's* assignments. This allegation is "confined to his own treatment, thus dooming this claim." *Torres v. Vasta*, No. 18-cv-8706, 2019 WL 4640247, at *4 (S.D.N.Y. Sept. 24, 2019).

Conversely, Count III, the Title VII claim, survives against Plaintiff's employer – the City – because he has sufficiently alleged that the decision to fire him was motivated by his race. But Count III is dismissed against the individual defendants, because "Title VII does not impose liability on individuals." *Lore v. City of Syracuse*, 670 F.3d 127, 169 (2d Cir. 2012) (collecting cases).

    c.  <u>Retaliation</u>

Both § 1981 and Title VII protect employees from retaliation if they complain about or oppose racial discrimination. *See Littlejohn*, 795 F.3d at 315. At the pleading stage, a plaintiff must present evidence that shows "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Id.* at 316 (quoting *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010)).

Plaintiff has sufficiently alleged retaliation.

At some time between October 31 Investigation Report and December 21 PDR – Plaintiff does not specify when exactly – he filed a complaint with the City's EEO Office against Warden Glenn for racial discrimination. (Compl. ¶ 137.) The EEO allegedly notified Warden Glenn about Plaintiff's EEO complaint "shortly thereafter." (*Id.* ¶ 138.) On January 5, Deputy Commissioner Pinnock terminated Plaintiff. (*Id.* ¶ 139.) Plaintiff has plausibly pled retaliation because his EEO complaint – his complaint of discrimination – was "followed closely in time" by the PDR (less than two months) and his termination (at most, about nine weeks) – the adverse employment actions. *See Vega*, 801 F.3d at 90–91.

Plaintiff states a claim for § 1981 retaliation against anyone involved in his termination – Warden Glenn and the Deputy Commissioner Defendants Cruz, Villalona, and Pinnock – as well as a claim for Title VII retaliation against the City.

### III.    Count II: Plaintiff's First Amendment Retaliation Claim is Dismissed in Part.

Pursuant to § 1983, Plaintiff claims Defendants retaliated against him because he reported the widespread abuse and corruption of Warden Glenn and the Captain Defendants in violation of his First Amendment right to free speech.

To survive a motion to dismiss, a plaintiff must plausibly allege that "(1) his speech or conduct was protected by the First Amendment; (2) the defendant took an adverse action against him; and (3) there was a causal connection between this adverse action and the protected speech." *Montero v. City of Yonkers, New York*, 890 F.3d 386, 394 (2d Cir. 2018) (quoting *Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 272 (2d Cir. 2011)).

Defendants argue that Plaintiff's speech was not "protected speech" under the First Amendment. This court agrees with Defendants as to all but two instances of speech identified by Plaintiff in his Complaint. But as to those two incidents, he states a claim.

While public employees "do not surrender all their First Amendment rights by reason of their employment, . . . the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). It does not protect speech that is "part-and-parcel" of the plaintiff's ability to execute his or her "official duties" is not citizen speech. *Montero*, 890 F.3d at 396 (quoting *Weintraub v. Bd. of Educ. of City Sch. Dist. of City of New York*, 593 F.3d 196, 203 (2d Cir. 2010)). In other words, on-the-job complaints about on-the-job conduct is unlikely to warrant First Amendment protection.

Plaintiff identifies eight discrete instances when he "spoke up," and each time he spoke, certain Defendants promptly retaliated against him. (Opp'n at 17-18.)

Most of Plaintiff's "speech" involved complaints about people committing acts of misconduct on the job. The following six instances of Plaintiff's speech are not "protected speech" for the purposes of First Amendment retaliation: (1) May complaint about Captain Richards "twerking," (2) May report of three COs planting contraband; (3) June 11 report of Plaintiff's UOF on an inmate; (4) when Plaintiff "refused to be silenced" after a June 21 inmate attack; (5) September reports of inmate attacks on 24-hour reports and requests to search inmates; and (6) paperwork about the September inmate attacks Plaintiff gave to Captain Verabal. (*See id.*)

Each of these instances consists of on-duty speech that is "part-and-parcel" of Plaintiff's ability to execute his "official duties," *see Montero*, 890 F.3d at 396, or otherwise "part of the practical reality of his everyday work," *see Matthews v. City of New York*, 779 F.3d 167, 174 (2d Cir. 2015). Surely a CO is expected to report the misconduct he or she witnesses on the job – whether by inmates or coworkers.

Moreover, Plaintiff's speech lacks a civilian analogue. Plaintiff argues that inmates could make complaints in a similar forum. But such intra-facility complaints to the command staff is hardly "the kind of activity engaged in by citizens who do not work for the government," such as "writing a letter to a local newspaper." *See Garcetti*, 547 U.S. at 423–24 (internal citations omitted).

Plaintiff's report that Captain Rupnarain asked Plaintiff to falsely testify on his behalf regarding a traffic ticket is "citizen speech," but it does not address a matter of public concern. "A public employee speaks 'as a citizen' when he or she refuses to commit a crime" – in this case, perjury – "because *all* citizens have a duty to follow the law." *Montero*, 890 F.3d at 396 (citing *Jackler v. Byrne*, 658 F.3d 225, 239–40 (2d Cir. 2011)). However, a DOC captain's traffic violation is not a matter of public concern. *See Negron v. City of New York*, No. 10-cv-2757, 2011 WL 4737068, at *17 (E.D.N.Y. Sept. 14, 2011), *report and recommendation adopted*, 2011 WL 4729754 (E.D.N.Y. Oct. 6, 2011). In *Negron*, the plaintiff reported to DOC commissioners that her union president coerced her to file a false statement about an incident that occurred with an inmate – specifically that she attempted to visit popular music artist Lil' Wayne, who was incarcerated in her unit. *See id.* at *16. Her report did not address a matter of public concern, and neither does a captain's attempt to get an employee to lie about a traffic ticket.

But certain speech by Plaintiff is protected by the First Amendment and Title VII.

In November or December 2017, Plaintiff filed a complaint with New York City's EEO Office against Warden Glenn for racial discrimination. In January, he was terminated. (Opp'n at 18; Compl. ¶¶ 137-38.) This speech is protected and causally connected to Plaintiff's termination.

Complaints to governmental agencies like the EEO or the EEOC alleging racial discrimination are protected speech. *See Raymond v. City of New York*, 317 F. Supp. 3d 746, 780–

81 (S.D.N.Y. 2018). A plaintiff may establish a causal connection by way of "temporal proximity between the speech and the retaliation." *See id.* at 773. "When a party relies on the mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action, courts uniformly hold that the temporal proximity must be very close," often no more than "two or three months." *See id.* at 773–74 (internal quotations and citations omitted). As explained above, *see supra* Section II(c), Plaintiff has alleged a "very close" proximity between his EEO complaint and the PDR (less than two months) and his termination (at most, about nine weeks). At this point, I am not willing to infer – against the plaintiff – that the Deputy Commissioners were unaware of his EEO complaint. Plaintiff states a claim for First Amendment retaliation against all individual defendants involved in his termination – Warden Glenn and Deputy Commissioner Defendants Cruz, Villalona, and Pinnock.

Finally, Plaintiff alleges a claim for retaliation based on his consultation with Deputy Warden Joseph Caputo. While this instance of protected speech is alleged in the Complaint (Compl. ¶¶ 110-11) it is not discussed in Plaintiff's brief (*see* Opp'n at 17-18). However, I do not deem this claim abandoned, *cf. Wu v. Metro-N. Commuter R.R.*, No. 14-cv-7015, 2015 WL 5567043, at *6 (S.D.N.Y. Sept. 22, 2015), particularly as Plaintiff's pleading states a viable claim on this basis.

Plaintiff consulted an outside deputy warden, Joseph Caputo, about the exchange of contraband between inmates and correctional staff, and how Warden Glenn and the captains at West Facility "continued to refuse to take any action." (Compl. ¶ 110.) Unlike Plaintiff's prior internal reports about discrete instances of misconduct, this speech is akin to that of the plaintiff police officer in *Matthews*, who reached out to precinct commanders he did not speak with in the usual course of business about a precinct-wide policy issue. *See* 779 F.3d at 174–75. "Serious

misconduct on the part of the head of a public [facility]" – like Warden Glenn at West Facility – is a matter of public concern. *Fierro v. City of New York*, 591 F. Supp. 2d 431, 443 (S.D.N.Y. 2008), *rev'd in part*, 341 F. App'x 696 (2d Cir. 2009) (reversed on qualified immunity grounds).

Plaintiff plausibly alleges a causal connection between this speech and an adverse action via direct evidence of a retaliatory animus. *See Raymond*, 317 F. Supp. 3d at 773. Plaintiff alleges that "Deputy Warden Caputo told Defendants that Plaintiff consulted him," and Captain Oudekerk and Captain Phillips threatened Plaintiff not to contact outside supervisory or administrative staff – like Caputo – regarding what he knew about the smuggling of contraband and assaults on staff. (Compl. ¶ 111.) Warden Glenn is also responsible for the retaliatory actions of Captains Oudekerk and Phillips as their supervisor because he "allowed," if not encouraged, this behavior; Plaintiff alleges that Warden Glenn actively suppressed evidence of his corruption to silence staff from speaking out. *See Case v. City of New York*, 233 F. Supp. 3d 372, 396–97 (S.D.N.Y. 2017) (quoting *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001)). (Compl. ¶ 46.)

The Complaint does not allege how or to what extent this consultation is related to any other adverse actions. But Plaintiff may rely on "mere temporal proximity" for the purposes of stating a claim. *See id.* Based on context, Caputo "told Defendants that Plaintiff consulted him" in mid- to late July. This timeline places the October 3 meeting and the October 31 Investigation Report – which ultimately led to Plaintiff's termination – within three months, which is "very close" to his complaint to Caputo. *See Raymond*, 317 F. Supp. 3d at 773–74.

Accordingly, Plaintiff has sufficiently stated a claim against those involved in his termination – Warden Glenn and the Deputy Commissioner Defendants – as well as Captains Oudekerk and Phillips.

Defendants argue that Plaintiff has failed to allege facts showing municipal liability for retaliation. In this they are correct.

"Under *Monell*, the City can be liable under § 1983 only when the alleged deprivation of rights occurs pursuant to a governmental policy, custom, or usage." *Cotto*, 2020 WL 1228765, at *3 (citing *Monell*, 436 U.S. at 690–91). Plaintiff does not plausibly allege that he was retaliated against pursuant to any *municipal* policy, custom, or practice.

Even when a plaintiff sufficiently alleges a warden's involvement in a constitutional violation, that alone is not sufficient to state a claim for *municipal* liability. *See Joseph v. NYC Dep't of Corr.*, No. 20-cv-1676, 2020 WL 2128860, at *3 (E.D.N.Y. May 5, 2020). Additionally, Plaintiff expressly alleges that West Facility was "subject to DOC's comprehensive regulations, directives, policies and procedures, Court Orders, and Consent Judgments governing nearly every aspect of correctional staff and employee conduct, including staff appearance and discipline, inmate separation, inmate discipline, *contraband*, and *use of force*. Warden Glenn implemented his own policies that *undermined or directly violated DOC's comprehensive written policies . . . .*" (Compl. ¶ 46 (emphasis added)). Accordingly, even though Warden Glenn was the top officer at West Facility (*see id.* at ¶ 43), the Complaint clearly establishes that he was not a municipal "policymaker" on reporting contraband or UOFs.

Moreover, "Plaintiff's Complaint contains no allegations that [] the City . . . has a 'policy, custom or practice' of violating the constitutional rights of individuals in Plaintiff's position— much less that such a policy or custom was the proximate cause of Plaintiff's injuries." *See Dames v. Pigott*, No. 18-cv-8352, 2019 WL 4014102, at *5 (S.D.N.Y. Aug. 26, 2019). To the contrary, the Complaint suggests that DOC policy would have prevented the mistreatment Plaintiff experienced.

31

In sum, Count II survives against Captains Oudekerk and Phillips, Warden Glenn, and the Deputy Commissioner Defendants. It is dismissed without prejudice against the City and the remaining individual defendants.

## IV. Count IV: Plaintiff's § 1985(3) Claims for Conspiracy to Deprive Plaintiff of Equal Protection are Dismissed in Part.

Plaintiff alleges that Defendants conspired to deprive him of his civil and constitutional rights under the First and Fourteenth Amendments and §§ 1981, 1983, and 2000e-2.

Section 1985(3) concerns depriving persons of rights or privileges. *See* 42 U.S.C. § 1985. To state a claim for conspiracy under Section 1985(3), the plaintiff must allege:

> 1) a conspiracy; 2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and 3) an act in furtherance of the conspiracy; 4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States. The conspiracy must also be motivated by some racial or perhaps otherwise class-based, invidious discriminatory animus.

*Dolan v. Connolly*, 794 F.3d 290, 296 (2d Cir. 2015) (internal citations omitted). Plaintiff brings this claim on two bases: discrimination on the basis of his race and retaliation for engaging in protected speech. Only the former states a claim.

*First*, Plaintiff's § 1985 claim based on racial discrimination survives. As discussed above, *see supra* Section II(b), Plaintiff has alleged facts to support inferences that: (1) Warden Glenn played a meaningful role in or otherwise instigated Plaintiff's termination, which was recommended and carried out by the Deputy Commissioner Defendants, and (2) all four of these individual defendants acted with a discriminatory intent.

Generally, individual defendants employed by a single municipal entity – here, DOC – are legally incapable of conspiring with each other. *See Raymond v. City of New York*, No. 15-cv-6885, 2017 WL 892350, at *6–7 (S.D.N.Y. Mar. 6, 2017). But Plaintiff has alleged that at least

Warden Glenn meets the exception to this rule – that he was motivated by an independent personal stake – i.e., to prevent Plaintiff from exposing the rampant contraband and other misconduct at West Facility to "shield against discipline, prosecution, and civil liability." *See id.* (*See* Compl. ¶¶ 51-54.) At this point, I am unwilling to dismiss Plaintiff's conspiracy claim for *racial* discrimination.

However, Plaintiff's conspiracy claim based on *First Amendment* retaliation is dismissed because he fails to allege any racial or class-based motivation.

That Defendants retaliated against Plaintiff for his speech is not "class-based." "[T]he term class 'unquestionably connotes something more than a group of individuals who share a desire to engage in conduct that the § 1985(3) defendant disfavors.'" *Dolan*, 794 F.3d at 296 (quoting *Town of W. Hartford v. Operation Rescue*, 991 F.2d 1039, 1046 (2d Cir. 1993)). Plaintiff fails to allege that he belonged to any protected class besides Caucasians.

Moreover, to the extent Plaintiff believes he is in a class by virtue of his speech, "the complaint does not disclose who besides [the plaintiff] may belong to this purported class. [The plaintiff]'s only claim is that he was discriminated against as an individual." *See Gleason v. McBride*, 869 F.2d 688, 695 (2d Cir. 1989). This is insufficient.

Count IV survives based on the alleged racially-motivated conspiracy to terminate Plaintiff between Warden Glenn and the Deputy Commissioner Defendants.

### V.       Count V: Plaintiff's Wrongful Termination Claim is Dismissed.

Plaintiff alleges that he was wrongfully terminated. Plaintiff does not identify under what federal, state, or local law under this claim arises.

"Apart from breach of an employment contract, no claim for wrongful termination exists in New York." *Rayskin v. City of New York*, No. 16-cv-2311, 2018 WL 8201893, at *3 (S.D.N.Y. June 26, 2018) (quotations and citations omitted).

Although Defendants do not specifically address Plaintiff's wrongful termination claim, they move to dismiss the Complaint in its entirely, and Plaintiff concedes that this claim "stem[s] from the same discriminatory and retaliatory conduct that underlie Plaintiff's other claims." (Opp'n at 21.) Plaintiff's claims for wrongful termination under federal law are separately alleged and separately addressed in this opinion. This general "wrongful termination" claim is dismissed. *See Stevens v. New York*, 691 F. Supp. 2d 392, 398–99 (S.D.N.Y. 2009).

## VI. Count VI: Plaintiff's § 8-107 Claim Alleging Racial Discrimination is Dismissed in Part.

Plaintiff alleges that Defendants targeted him on account of his race by taking a variety of adverse employment actions against him in violation of N.Y.C. Admin. Code § 8-107.

This section of the New York City Human Rights Law ("NYCHRL") makes it an "unlawful discriminatory practice . . . for an employer or an employee or agent thereof, because of the actual or perceived . . . color [or] national origin . . . to discharge from employment such person; or [] to discriminate against such person in compensation or in terms, conditions or privileges of employment." N.Y.C. Admin. Code § 8-107(1)(a).

To state a claim of discrimination under the NYCHRL, Plaintiff "must allege that he was treated less well because of his membership in a protected class." *Gonzalez v. City of New York*, 377 F. Supp. 3d 273, 300 (S.D.N.Y. 2019) (internal quotations, alterations, and citations omitted). While similar to federal employment discrimination claims under § 1983 and Title VII:

> "the NYCHRL requires an independent analysis" from Title VII and [state law] claims. Courts must analyze NYCHRL claims separately, construing its provisions "broadly in favor of discrimination plaintiffs, to the extent that such a construction

34

is reasonably possible." The NYCHRL is not a "general civility code," however, and "plaintiff still bears the burden of showing that the conduct is caused by a discriminatory motive."

*Bliss v. MXK Rest. Corp.*, 220 F. Supp. 3d 419, 424 (S.D.N.Y. 2016) (quoting *Mihalik v. Credit Agricole Cheuvreux N. America, Inc.*, 715 F.3d 102, 109 (2d Cir. 2013)). Plaintiff's claim meets this standard.

For the same reasons stated above, *see supra* Section II(b), Plaintiff has sufficiently alleged that was "treated less well" by Warden Glenn and the Deputy Commissioner Defendants because he is white, such that his employer – the City – may be held liable under the NYCHRL.

Plaintiff may also hold these four individual defendants personally liable. As explained above, Warden Glenn – Plaintiff's supervisor – and the Deputy Commissioner Defendants – who were directly responsible for the decision to terminate Plaintiff – were personally involved in or otherwise "aided and abetted" the alleged discriminatory conduct. *See Lewis v. Roosevelt Island Operating Corp.*, 246 F. Supp. 3d 979, 992 (S.D.N.Y. 2017).

Count VI survives against the City, Warden Glenn, and the Deputy Commissioner Defendants. For the reasons discussed above, Count VI is dismissed without prejudice against the Captain Defendants.

## VII.   Count VII: Plaintiff's § 290 Claim Alleging Racial Discrimination is Dismissed in Part.

Plaintiff alleges that Defendants targeted him on account of his race by taking a variety of adverse employment actions against him in violation of N.Y. Exec. Law § 290.

Claims of employment discrimination under this section, known as the New York (State) Human Rights Law ("NYSHRL"), "are analyzed under the same *McDonnell Douglas* framework applied to Section 1983 and Title VII claims of employment discrimination." *Bermudez v. City of New York*, 783 F. Supp. 2d 560, 576 (S.D.N.Y. 2011). With respect to individual defendants, the

NYSHRL requires the same personal involvement requirement as the NYCHRL. *See Lewis*, 246 F. Supp. 3d at 992. Therefore, for the same reasons stated above, Plaintiff states a claim against the City, *see supra* Section II(b), as well as Warden Glenn and the Deputy Commissioner Defendants, *see supra* Section VI.

Count VII survives against the City, Warden Glenn, and the Deputy Commissioner Defendants. Count VII is dismissed without prejudice against the Captain Defendants.

## VIII.   Count VIII: Plaintiff's Hostile Work Environment Claims are Dismissed in Part.

Plaintiff alleges that Defendants created a hostile work environment by discriminating against him on the basis of his race, and by retaliating against him for engaging in First Amendment-protected speech.

Plaintiff does not identify any federal, state, or local law under which his claim arises; rather, he labels this claim "Hostile Work Environment, Discrimination, and Harassment," and then proceeds to allege that Defendants created a hostile work environment. A hostile work environment claim may arise under § 1981, § 1983, Title VII, the NYSHRL, and the NYCHRL. *See Isbell v. City of New York*, 316 F. Supp. 3d 571, 591 (S.D.N.Y. 2018); *Carter v. Verizon*, No. 13-cv-7579, 2015 WL 247344, at *8 (S.D.N.Y. Jan. 20, 2015). Plaintiff's federal and state law claims are evaluated under the same standard, whereas his NYCHRL claim is analyzed separately under a more permissive standard. *See Isbell*, 316 F. Supp. 3d at 591, 593.

a.   <u>Federal and State Law Claims</u>

To state a claim for hostile work environment under the federal statutes or the NYSHRL, a plaintiff must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Littlejohn*, 795 F.3d at 320–21 (quoting *Harris v.*

*Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). Courts consider "the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Littlejohn*, 795 F.3d at 321 (quoting *Harris*, 510 U.S. at 21). However, a plaintiff "will not have a claim . . . unless she can also demonstrate that the hostile work environment was caused by animus towards her as a result of her membership in a protected class." *Bermudez*, 783 F. Supp. 2d at 578 (internal citation omitted).

For the purposes of Plaintiff's Title VII claim, the continuing violation exception routinely applies to hostile work environment claims under Title VII, which by their "very nature involve[] repeated conduct." *Morgan*, 536 U.S. at 115. As noted above, this court may consider the entire period of the hostile environment – even component acts thereof that fall outside the 300-day statutory time period. *See id.* at 117; *supra* Section II(a).

Plaintiff alleges that, during his first eight months at West Facility, Warden Glenn – his supervisor – manufactured phony charges against Plaintiff on account of his race, encouraged inmates to attack Plaintiff, and on October 3, yelled and cursed at Plaintiff, mentioned his race, and threatened to fire him. The Deputy Commissioner Defendants then followed through on this threat by recommending to fire, and ultimately terminating, Plaintiff. These actions – which I have inferred, at this stage, were imbued with a racial animus – created an abusive working environment.

Accordingly, Plaintiff has stated a Title VII hostile work environment claim against the City. Plaintiff has also stated a § 1983 hostile work environment claim against Warden Glenn and the Deputy Commissioner Defendants because they directly participated in the discriminatory conduct that contributed Plaintiff's hostile working environment. *See Dawson v. Cty. of Westchester*, 351 F. Supp. 2d 176, 196 (S.D.N.Y. 2004). For the same reasons stated above, *see*

*supra* Section II(b), Plaintiff has not, however, sufficiently alleged that this misconduct was the product of a municipal policy, practice, or custom to support a § 1983 claim against the City.

Under the NYSHRL, which permits individual liability, Plaintiff has stated a hostile work environment claim against Warden Glenn and the Deputy Commissioner Defendants. *See Marchuk v. Faruqi & Faruqi, LLP*, 100 F. Supp. 3d 302, 307 (S.D.N.Y. 2015). As Plaintiff's employer, the City is only liable for its agents' harassing behavior that it "encouraged, condoned, or expressly or impliedly approved." *See id.* Plaintiff has alleged that he complained to the City's EEO Office about Warden Glenn's racial discrimination and was terminated thereafter. Without knowing more about the City's reaction – or lack thereof – to this complaint, I will not dismiss Plaintiff's NYSHRL claim against the City.

b. City Law Claims

To state a claim for hostile work environment under the NYCHRL, a plaintiff "need only allege 'the existence of unwanted gender-based [or race-based] conduct.'" *Isbell*, 316 F. Supp. 3d at 593 (alteration in original) (quoting *Bermudez*, 783 F. Supp. 2d at 579). NYCHRL claims are "construed liberally," and "while courts may still dismiss truly insubstantial cases, even a single comment may be actionable in the proper context." *Isbell*, 316 F. Supp. 3d at 593 (quoting *Mihalik*, 715 F.3d at 109, 113).

Since Plaintiff has sufficiently alleged a hostile work environment under the higher standards of § 1983 and the NYSHRL against Warden Glenn and the Deputy Commissioner Defendants, *see supra* Section VIII(a), his claim under the more permissive NYCHRL survives as well.

38

Unlike the NYSHRL, the NYCHRL "permits an employer to be held vicariously liable for an employee's conduct if the employee is the plaintiff's supervisor." *Marchuk*, 100 F. Supp. 3d at 308. Accordingly, Warden Glenn's misconduct supports a claim against the City.

Count VIII survives against the City, Warden Glenn, and the Deputy Commissioner Defendants. Count VIII is dismissed without prejudice against the Captain Defendants.

## CONCLUSION

Defendants' motion to dismiss Count V of Plaintiff's Complaint is granted with leave to replead. Defendant's motion to dismiss Counts I, II, III, VI, VII, and VIII is granted with leave to replead as to all Defendants except Defendants Denise Phillips, Quincy Oudekerk, Clement Glenn, Antonio Cruz, Angel Villalona, Nadene Pinnock, and the City of New York as limited by this opinion. The amended complaint is due within 21 days. The Clerk of Court is directed to remove the motions at Dkt. Nos. 48 and 56. This constitutes the written decision and order of the Court.


Dated: June 22, 2020

_____
Chief Judge


BY ECF TO ALL PARTIES